IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

RODRIGUEZ MORGAN,
*Defendant.*

Criminal Action No. ELH-17-232

**MEMORANDUM OPINION**

Proceeding pro se, Rodriguez Morgan filed a motion for compassionate release on April 20, 2020. ECF 460. The government opposed the motion. ECF 483. I denied that motion, without prejudice, because the defendant had not exhausted his administrative remedies. ECF 485.

Thereafter, through counsel, Morgan filed an "Emergency Motion For Compassionate Release Pursuant To 18 U.S.C. § 3582(c)(1)(A)(i)." ECF 494 (the "Motion"). It is supported by exhibits. ECF 494-1 to ECF 494-2. Morgan has also filed three "Supplements." *See* ECF 499; ECF 501; ECF 502. The government opposes the Motion. ECF 509.[1] No reply was filed, and the time to reply has expired.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

---

[1] The government initially opposed the Motion by way of a letter, asserting that the defendant again failed to establish that he had exhausted his administrative remedies. ECF 498. On August 5, 2020, Morgan filed a "Supplement" to the Motion, which stated that he had filed a petition for compassionate release with the Warden of FCI Ashland. ECF 499. The Supplement also asked the Court to stay the Motion pending a response from the Warden or until 30 days had elapsed from the date of the petition, whichever was earlier. *Id.* Accordingly, I stayed the case. ECF 500.

## I. Background

On June 6, 2017, the defendant was one of eleven defendants charged with conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846. ECF 20 (Superseding Indictment). A Second Superseding Indictment was filed on August 1, 2017, charging Rodriguez in Count One with conspiracy to distribute and possess with intent to distribute heroin, fentanyl, and cocaine, in violation of 21 U.S.C. § 846. ECF 93. The defendant had an initial appearance on June 29, 2017. ECF 36. After a pretrial detention hearing on July 5, 2017, Morgan was released on pretrial supervision. ECF 62, ECF 63.

Pursuant to a Plea Agreement (ECF 261), the defendant entered a plea of guilty to Count One of the Second Superseding Indictment on April 11, 2018. ECF 260. The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of 120 months' imprisonment. *Id.* ¶ 8. That term corresponded to the mandatory minimum sentence of ten years. *Id.* ¶ 3(a).

The Plea Agreement also contained a stipulation of facts. *Id.* ¶ 6. According to the stipulation, beginning no later than April 2016, the defendant participated in a conspiracy in Baltimore to "obtain wholesale quantities of heroin and distribute one kilogram or more of that heroin at the street-level." *Id.* The Drug Enforcement Administration's investigation included intercepted communications, demonstrating that Morgan "was a member of an organization selling heroin in Baltimore." *Id.* Notably, the defendant "was an organizer" of the drug trafficking organization. *Id.* A search of the defendant's residence uncovered 440 grams of a carfentanil. *Id.*

The Amended Presentence Report ("PSR," ECF 327) reflects that Morgan had a final offense level of 31. *Id.* ¶ 31. In particular, the defendant had a base offense level of 30, and received a four-level enhancement because of his role as an organizer or leader of criminal activity

involving five or more participants.   *See id.* ¶¶ 14, 17.  The defendant also received a three-level downward adjustment for his acceptance of responsibility.  *Id.* ¶¶ 21, 22.

Morgan had a Criminal History Category of III.  *Id.* ¶ 33.  In particular, he had three prior Maryland convictions for drug offenses.  *See id.* ¶¶ 27, 28, 30.  In 2006, the defendant was convicted of possession with intent to distribute cocaine and distribution of cocaine, for which he served two months' imprisonment.  *Id.* ¶ 27.  In 2008, Morgan was convicted of unlawful possession of heroin.  *Id.* ¶ 28.  He was sentenced to two years of incarceration, with all but two days suspended, and two years of probation.  *Id.*  In 2010, Morgan was convicted of a violation of probation.  *Id.*  And, in 2013, the defendant was convicted of possession of a controlled substance and received a suspended sentence of one year of incarceration, with one year of probation.  *Id.* ¶ 30.

Based on a final offense level of 31 and a Criminal History Category of III, the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") called for a term of imprisonment ranging from 135 months to 168 months.  *Id.* ¶ 62.

Sentencing was held on June 26, 2018.  ECF 330.  At the time of sentencing, Morgan, who was born in January 1986, was 32 years old.  *Id.* at 3; *id.* ¶ 43.  With respect to the defendant's health, the PSR stated: "[Morgan] has asthma and has two inhalers."  *Id.* ¶ 50.

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), I imposed a 10-year sentence, which corresponded to the mandatory minimum.  ECF 327, ¶ 61; *see* 21 U.S.C. § 841(b)(1)(A); *see also* ECF 331; ECF 332.  Morgan's sentence was well below the advisory sentencing Guidelines range. The defendant was ordered to surrender on September 4, 2018.  ECF 331 at 2.

The defendant is now 34 years old.  According to the Motion and the opposition, the defendant is incarcerated at FCI Ashland.  *See* ECF 494 at 1; ECF 509 at 1; *see also* ECF 483-3 at

1.  However, the website for the Bureau of Prisons ("BOP") indicates that the defendant is currently incarcerated at USP Big Sandy.   *See Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed November 23, 2020).

The BOP website also indicates that Morgan has a projected release date of February 25, 2027.  *Id.*  To date, the defendant has served approximately 27 months of his sentence, which amounts to roughly 20% to 25% of his sentence.

## II.  Legal Standard

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant *see*king compassionate release had to rely on the BOP Director for relief.  *See, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying motion for compassionate release because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on*

*Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with the policy statement issued by the Sentencing

Commission in U.S.S.G. § 1B1.13.

As indicated, in resolving a compassionate release motion, a court must consider the factors in 18 U.S.C. § 3553(a). *See Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, ___ Fed. App'x ___, 2020 WL 6743609, at *2 (4th Cir. Nov. 17, 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). And, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." U.S.S.G. § 1B1.13(1)(A) provides for a sentence reduction based on "extraordinary and compelling reasons," and § 1B1.13(1)(B) provides for a reduction based on age, in combination with other requirements. U.S.S.G. § 1B1.13(2) establishes as a relevant factor that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The Application Notes permit compassionate release based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows (emphasis added):

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist

under any of the circumstances set forth below:

(A)   **Medical Condition of the Defendant**.—

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

 (I)  suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D) is titled "**Other Reasons.**" It permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D).

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *Taylor*, 2020 WL 5412762, at * 1.

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 827. But, compassionate release is a "rare" remedy. *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[2]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[3] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

---

[2] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[3] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Moreover, although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted). As of November 30, 2020, COVID-19 has infected approximately 13.4 million Americans and caused nearly 267,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Nov. 30, 2020).

The COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393 (6th Cir. 2020). Indeed, for a significant period of time, life as we have known it came to a halt. And, in view of the recent resurgence of the virus, schools, colleges and businesses that had opened are again facing closure or restrictions.

Unfortunately, there is currently no vaccine, cure, or proven treatment that is available, although it appears that a vaccine is on the horizon. Moreover, according to the Centers for Disease Control and Prevention ("CDC"), certain risk factors increase the chance of severe illness. Those

risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.   *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.   Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.   *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (November 2, 2020), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the BMI is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; smoking; sickle cell disease; pregnancy; and Type 2 diabetes.

The CDC has also created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include cerebrovascular disease, hypertension, pregnancy, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, smoking, and Type 1 diabetes. *See id.* Moderate to severe asthma is an underlying medical condition that was moved to the new category by the CDC; it is now identified as a condition that "might" put an individual at higher risk for COVID-19 complications. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing."   *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed Nov. 11, 2020).   Social distancing

is particularly difficult in the penal setting, however.  *Seth*, 2020 WL 2571168, at *2.  Prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see also Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they readily able to isolate themselves.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the BOP from COVID-19.  The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. *See* ECF 745 at 10-12 (detailing measures that BOP has implemented at BOP facilities). Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, however, the virus persists in penal institutions.[4] As of November 24, 2020, the BOP had 125,271 federal inmates in BOP-managed institutions, 14,102

---

[4] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450

federal inmates in community-based facilities, and approximately 36,000 staff.  Also as of November 11, 2020, the BOP reported that 3,891 inmates and 1,264 BOP staff currently tested positive for COVID-19; 18,821 inmates and 1,773 staff had recovered from the virus; and 143 inmates and two staff member have died from the virus.  Moreover, the BOP has completed 78,207 COVID-19 tests.  *See COVID-19*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed Nov. 24, 2020).

With respect to USP Big Sandy, where the defendant is now apparently a prisoner, as of November 30, 2020, the BOP reported that five inmates and 26 staff members currently have tested positive for COVID-19 and 24 inmates and 40 staff have recovered at the facility.  No inmates have died.   And,  the  facility  has  completed  571  COVID-19  tests  of  inmates.   *See* https://www.bop.gov/coronavirus/ (last accessed Nov. 24, 2020).  With respect to FCI Ashland, as of November 30, 2020, the BOP reported that 171 inmates and 17 staff members currently have tested positive for COVID-19 and eight inmates and six staff have recovered at the facility.  No inmates have died.  And, the facility has completed 395 COVID-19 tests of inmates.  *See id.*

## IV.  Discussion

Morgan has moved for compassionate release on the ground that his "severe asthmatic condition," which "requires an inhaler and steroids," renders him particularly vulnerable to

---

inmates and correctional officers have died" from COVID-19.  *See Cases in Jails and Prisons*, N.Y. TIMES (Oct.  29,  2020),  https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

And, on November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, 2020, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://nyti.ms/2IP2EJD.

COVID-19.  *See* ECF 494 at 6.  Further, Morgan appears to contend that, if released, he would not pose a danger to the community.  For instance, Morgan highlights that he has not incurred any disciplinary infractions while serving his sentence, "he has been reclassified to a low security status," and he did not violate the conditions of his 15-month pretrial release.  *Id.* at 5-6.

With respect to the defendant's medical condition, the government acknowledges that "his history of asthma is well documented."  ECF 509 at 17.  Further, the government concedes that Morgan's asthma constitutes an extraordinary and compelling reason under Application Note 1(A)(ii)(I) to U.S.S.G. § 1B1.13 U.S.S.G.  *Id.*  Nevertheless, the government maintains that Morgan's condition does not warrant compassionate release.  *Id.*

The defendant's medical records reflect that he has a history of asthma.  *See, e.g.*, ECF 483-2 at 1, 20-21.  In addition, the records demonstrate that, while incarcerated, the defendant has made "increased use" of his "rescue inhaler" and has been prescribed an additional medication as recently as May 2020.  *See id.* at 21, 54; ECF 483-3 at 5.  In light of the extensive documentation of the defendant's medical condition and the government's concession, I am satisfied that Morgan's asthma constitutes an "extraordinary and compelling" basis for relief.  That conclusion does not end the inquiry, however.

The Court must also consider whether, if released, Morgan would pose a danger to the community, as provided in 18 U.S.C. § 3142(g).  *See* 18 U.S.C. § 3582(c)(1)(A)(ii).  And, the Court must consider the factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any

pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The government urges the conclusion that, if released, Morgan "might again engage in drug trafficking."   ECF 509 at 21.   In support, the government emphasizes the nature and circumstances of the offense.   As noted, carfentanil was seized at the defendant's residence. According to the government, carfentanil is deadly and even more dangerous than fentanyl.  *Id.* at 20.   In addition, the government contends that the defendant's long history of drug crimes, with convictions dating back to 2006, counsels against release.  *Id.* at 21.

I agree with the government that the nature of Morgan's offense weighs heavily here. Morgan was an organizer of a drug trafficking organization.  ECF 260, ¶ 6.  And, as the government underscores, a highly dangerous controlled substance—carfentanil—was seized at his residence. *Id.*

To be sure, the defendant deserves commendation for not incurring any disciplinary infractions while incarcerated and for not violating the conditions of his pretrial release.  However, Morgan has only served about 25% of his sentence.

Given the facts of the offense, coupled with the defendant's prior criminal history and the abbreviated time that defendant has been incarcerated, the Court concludes that release under 18 U.S.C. § 3582(c)(1)(A) is not warranted at this time.

### V.  Conclusion

For the forgoing reasons, I shall deny the Motion (ECF 494), *without prejudice*.

An Order follows, consistent with this Memorandum Opinion.


Date:   December 1, 2020                                    _____/s/_____
                                                                             Ellen Lipton Hollander
                                                                             United States District Judge